**The COLEMAN COMPANY, Inc., a corporation, Appellant,**

v.

**HOLLY MANUFACTURING COMPANY, a corporation, Appellee.**

**No. 14711.**

United States Court of Appeals
Ninth Circuit.

April 10, 1956.

Rehearing Denied July 31, 1956.

Lyon & Lyon, Frederick W. Lyon, Los Angeles, Cal., for appellant.

James B. Christie, Richard B. Hoegh, Pasadena, Cal., for appellee.

Before HEALY, BONE and CHAMBERS, Circuit Judges.

BONE, Circuit Judge.

Appellee Holly Company, (sometimes hereafter referred to as Holly) a California corporation and plaintiff below, brought this action charging defendant-appellant Coleman Company, (sometimes hereafter referred to as Coleman) a Kansas Corporation, with infringement of Letters Patent secured by Hollingsworth, et al., No. 2,602,441 on July 8, 1952 and duly assigned to Holly, the owner of the patent. The patent in suit covers a gas-burning wall-heater which is a mechanical apparatus.

The allegations of appellee's original complaint were expanded in a first supplemental complaint.[1] Appellant's an-

1. The specific charge of infringement set forth in the first supplemental complaint

was that *prior* to the filing of the instant suit and service of the complaint, ap-

swers to both complaints alleged generally (to quote its brief) that said Letters Patent and all claims were invalid and void for the following reasons:

(a) The invention or inventions purported to have been patented had been described in printed publication prior to the supposed invention and discovery by Hollingsworth.

(b) That Hollingsworth was not the first inventor of the material and substantial part of the thing claimed in said patent.

(c) That the invention or inventions purported to be patented thereby did not constitute patentable novelty or invention within the meaning of the patent laws, in view of the prior state of the art, and in view of what was common knowledge on the part of those skilled in the art, prior to the date of the alleged invention or inventions of the patentees.

Appellant also denied that claimed acts of infringement by it "ever took place."

In an interlocutory judgment the lower court held that claims 1, 2, 3 and 4 of the said patent were valid and had been infringed by Coleman.[2] By way of relief it granted an injunction prohibiting further infringement of the claims

pellant had manufactured and sold *four* "models" of its gas-burning wall heaters (Models 64, 67, 68 and 69) which *included* "a secondary heat exchanger *four feet in length* known as (appellant's) 4-foot economizer," and that these models "embodied the invention claimed in appellee's Letters Patent"; that *since* on or about November 2, 1953, appellant had been manufacturing and selling these same (four) models which were then made to *include* and still include "a secondary heat exchanger *three feet in length* known as appellant's 3-foot economizer"; that appellant since November 2, 1953 has been making, using and selling these four gas-burning models, and will continue to do so unless restrained by the Court.

On this appeal (and doubtless for the sake of brevity) appellant referred to the *upper* flue (or secondary radiator) together with the surrounding *upper box*, as "the economizer," or "secondary heat exchanger." These were used as informal identifying terms and we so employ them.

2. The claims set forth in the patent are as follows:

"1. In a wall heater for burning gas, the combination which comprises a first box adapted to be mounted in a wall of a room to extend upward therein from a level near the floor of the room to a level part way to the ceiling, a first hollow radiator mounted in the box and spaced from the walls thereof, means for burning fuel in the first radiator, means connected to the lower portion of the first box for introducing air thereinto near the floor of the room, means connected to the upper portion of the first box for discharging air into the room from the box near its top, a second box adapted to be mounted in the wall above the first box to extend from a level just above the first box to a level near the ceiling, a second hollow radiator disposed in the second box and spaced from the walls thereof, the horizontal cross section of the second radiator being substantially smaller than that of the first radiator, means connected with the upper portion of the second box for discharging air from the second box into the room just below the ceiling, a draft hood provided with a relief opening into the room and connecting the top of the first radiator with the bottom of the second radiator, said second hollow box having an inlet opening adjacent the bottom thereof and adapted to receive air flowing upward outside the first box and inside the wall, and a flue connected to the top of the second radiator.

"2. Apparatus according to claim 1 provided with a baffle disposed in the first box behind the first radiator and spaced from the raditor and also from the rear wall of the box.

"3. Apparatus according to claim 1 provided with a baffle disposed in the first box behind the first radiator and spaced from the radiator and also from the rear wall of the box to provide a conduit between the rear wall of the box and the baffle, said conduit being open at the bottom and also at the top and in communication at the top with the interior of the first box.

"4. Apparatus according to claim 1 in which the second radiator is composed of a shallow front member and a shallow rear member.

"5. Apparatus according to claim 1 in which the second box is composed of a shallow front member and a shallow rear member."

and ordered an accounting for damages. This appeal followed.

### The Patent in Suit.

The patent in suit is an insulated mechanical room-heating appliance of a size and shape and so designed as to be easily fitted into the wall of a room between two studs in a standard wall partition. Outwardly, the entire integrated device resembles two shallow metal "boxes" rectangular in shape which (except as herein noted) fully enclose all of the interior parts within their metal covering. In accordance with the invention the complete device is really two box-like sections, one being placed on top of the other. The lower section is placed in position immediately above the floor level of the room to be heated; the upper box reaches to the ceiling of the room.

Within the center of this lower box section (which occupies somewhere near half of the total length of the complete device) is installed a long hollow metal "combustion chamber" or "radiator" with a much smaller horizontal cross section than the surrounding "jacket" which constitutes the metal insulated "wall" of the device. To a layman this "radiator" might be likened to a centrally located sort of tube or funnel. It contains a gas burner which furnishes the heat for the patented device, this burner being positioned at or near the bottom of the radiator.

Passing along the sides of this lower radiator are air passages which serve as conduits to conduct or pass upward along the sides of the "radiator" currents of air which become heated by contact with the radiator. This air is admitted into the device through a separate intake grille or aperture facing the open room and located at the base of the lower half of the device at a point near the floor level and opposite the gas burner.

Opposite the upper end of the room side of the lower box section of the two-part assembly is located what is designated in the patent as the "lower grille" or hot air vent which passes air heated by the lower radiator into the room area at a point about midway of the length of the patented device. This particular heat outlet is designated in a diagram shown in the patent as the "1st stage warm air discharge." At a point just above this particular outlet grille the resulting gasses from the "lower or first radiator" rise and pass into and through the area occupied by a so-called "draft diverter" or "draft hood" into a "second" but smaller metal radiator occupying a center position in the upper box-half of the patented device. After passing through this "second" or upper "radiator" these gasses are discharged into a flue connected with the top of the second radiator and from this point are vented into the atmosphere above the top of the house.

The patent specifications set forth that "no damper or the like for constricting the flow of the flue gas through these two radiators is provided, and a 'draft diverter' is connected between the two radiators, instead of at the flue, as is customary." The specifications further recite that "this diverter has its relief opening into the room, preferably through the box in which the lower radiator is placed." (See later reference to the "draft hood" which is this "diverter" device.)

The lower "radiator" appears from a trial exhibit to be somewhere near the length of the lower box of appellee's device, and its top is open so that heat not transferred by this radiator remains in gaseous products of combustion and is "wasted" up the flue connected to the top of the radiator and then into and through the second "radiator" located in the upper box. From a diagram in the Letters Patent and from a hand-drawn exhibit in evidence, this upper or so-called "secondary radiator" (like the lower radiator) occupies nearly the full length of the upper half section of the entire apparatus. The horizontal cross-section of the upper radiator is uniform in size and is considerably smaller than the lower radiator. There is no gas burner in this (secondary radiator be-

cause its function is merely the utilization of heat passing into it from the lower radiator. As in the case of the lower radiator, it is centrally positioned and has air passages surrounding it in which air heated by contact with this radiator may freely circulate. This warm air then passes into the room through an "upper grille" referred to in the patent as the "2nd stage warm air discharge," the grille being located a short distance below the ceiling of the room.

The "upper half" or box section of appellee's apparatus receives the air thus heated by its "secondary radiator" through a *separate* grilled aperture located at the base of the lower unit or box section, and this air is carried up in, and around, the lower radiator box by an independent and enclosed air passage or conduit positioned adjacent to the back or wall side of *both* upper and lower boxes and finally diverted into the room through the "2nd stage warm air discharge" after passing alongside and being warmed by the second radiator.

Positioned between the two "radiators" above referred to is the so-called "draft diverter" or "draft hood" device mentioned above. This part or open area of the patented device constitutes a kind of "gap" or "recess" in the apparatus between the upper and lower "boxes." It opens directly into the room through a "grille", and its function and purpose is (by the use of suitable "baffles") to prevent a strong atmospheric "down-draft" which might enter the device through the roof flue or final vent, from forcing its way down into the lower (gas-burning) radiator and adversely affecting the combustion zone in this radiator and possibly extinguishing its gas burner thus permitting raw gas to escape into the room. It is claimed that this "draft hood" or "draft diverter" permits such a down-draft of air (if any occurs) to "escape" directly into the room thus lessening or removing outside air pressure on the gas flame. It is noted in the specifications that adjusta-

ble dampers are not satisfactory in the flue of a gas-burning device because of the possibility of asphyxiation. Also, that the second (upper) radiator, as a conduit, "will just handle the maximum products of combustion to be conducted in the first radiator, with scarcely any dilution through the draft hood."

The specifications also recite that "the structure of the invention is such that the *hotter* air is brought out into the room at an intermediate level while *cooler* but still warm air is introduced into the upper part of the room near the ceiling by the 2nd stage warm air discharge thus reducing stratification and increasing air circulation in the room."

The lower radiator containing the gas burner appears from a trial exhibit to be somewhere near the length of the "lower box" of appellee's device. Its top is open so that heat not transferred by this radiator remains in gaseous products of combustion and is "wasted" up the flu connected to the top of this radiator into the upper radiator, the two radiators being (thus) connected in series. By this arrangement gas is burned only in the lower radiator with the resulting flue gasses rising through the upper or "secondary radiator" and as we have indicated, are finally discharged into a flue connected at its top which vents them into the atmosphere above the top of the house.

The upper box section which contains the so-called "secondary radiator" (to quote the specifications) "extends from the top of the 'recess' (draft hood) to the ceiling of the room." (This *upper radiator* and surrounding box was referred to by witnesses as "an *economizer* or secondary heat exchanger.") (See note 1 for reference to this "economizer.") Its purpose (as set forth in the patent) is to scavenge some of the heat that naturally passes out of the lower radiator into this radiator, and also to prevent the upper radiator from dangerously heating the surrounding walls. The specifications point out that both radiators are oblong in section and are

constructed of a dark-surfaced heat radiating metal.

It is noted in the specifications that an outer air space placed between the jacket (metal enclosure of the box) and the radiators, (and particularly with respect to the upper box) is an arrangement which "aids in preventing excessive heating of the wall" back of the upper radiator.

As to the heat-producing character of appellee's device, the specifications set forth that the area *inside* the lower radiator immediately adjacent to the gas burner may attain a temperature as high as 2000° F. The hot gases in rising *through* the lower radiator *decrease* in temperature to about 650° F although this temperature is "reduced slightly" *in* the "draft hood." The air passing the lower radiator through the side jackets in the lower exchanger may have a temperature of about 70° F but in passing up the air passages in the lower box which are near the lower radiator, the temperature of this air is *increased* to about 375° F at which temperature it is discharged into the room through the "1st stage warm air discharge."

Cold air (at about 70° F) is likewise admitted to the device at the floor level of the lower box (as above noted) and passes up on the wall side of the box to and into the top box containing the "secondary heat exchanger." This air passes alongside the upper radiator and is finally discharged into the room through the upper or "2nd stage warm air discharge" at which time the air has attained a temperature of 165° F.

Working models of both the patent in suit and claimed four infringing devices, along with drawings and schematic diagrams of these devices, were in evidence before the trial court. They were introduced to illustrate the construction and functional operations of both sets of devices and the court was thus able to follow and appraise the claims of both parties by a visual examination of the construction and physical characteristics of the combinations involved in this suit. It was in position to compare their mechanical factors and elements with the claims recited in appellee's Letters Patent, as illuminated by the "specifications" therein. The functioning of these devices in actual operation, and the results claimed to have been achieved were thoroughly covered and discussed in the testimony of witnesses, including that of a patentee of the Holly device.

The Prior Art.

Appellant presents an elaborate recital in the way of a specification of errors which embodies forty-eight detailed claims. These numerous and lengthy claims of error attack as without justification or foundation practically all of the holdings of the court as set forth in its findings, conclusions and interlocutory judgment. The interlocutory judgment embodies a sweeping order enjoining appellant from such activities as thereafter making, causing to be made, offering or threatening to make, or using or causing to be used, or offering or threatening to use, or selling or causing to be sold, or offering or threatening to sell or contributing to the making, using or selling of appellee's combination, for the remainder of its patent term.

This injunction order covers appellant's wall heater models 64, 67, 68 and 69, or any wall heaters of substantially the same construction as appellee's patented wall heater, for the remainder of its patent term. The judgment also directed that the cause be referred to a Master pro hoc vice to hear and determine any accounting as to damages suffered by appellee, including damages arising from use and sale of appellant's wall heaters of the models above noted equipped both with the 4-foot economizer and the 3-foot economizer. The court reserved decision on any prayer for increased damages or attorney's fees until after determination of appellee's damages.

Appellant has boiled down and summarized its numerous claims of error by tendering six specific "points" wherein it greatly narrows the material and controlling issues tendered on this appeal. These points are:

"1. The patent in suit is invalid and void as anticipated by the patent to McLeod.

"2. The patent in suit does not point out and distinctly claim the alleged invention.

"3. Defendant's 4-foot economizer does not infringe the patent in suit.

"4. Defendant's 3–foot economizer does not infringe the patent in suit.

"5. Both heaters manufactured by defendant are constructed in accordance with the teachings of the prior patents to Browell and Hamilton.

"6. Plaintiff has lost all right to equitable relief by its actions during the pendency of this litigation."

At trial, appellant introduced in evidence fourteen patents to exemplify prior art in house-heating devices or appliances, However, in its brief (and as above indicated) it has seen fit to discuss, compare and principally rely upon as anticipation of the Holly device, only three prior patents in the house-heating field of art. These are the earlier patents of McLeod, No. 1,361,389; Browell, No. 268,860, and Hamilton, No. 311,313. They are the only ones to which appellant devotes serious argument, and a reference to their structural and functional characteristics seems necessary because it will serve to point up the great difference between them and the Holly device.

The McLeod patent (1920) is a room heating set-up which utilized as its source of heat the conventional open-faced fireplace of that period furnished with the customary grates and burning solid fuel such as wood or coal. These specifications and schematic diagrams shown in the Letters Patent indicate that the patentee was describing his physical set-up by reciting generally that his patent represented certain new and useful improvements in auxiliary fireplace heaters designed to conserve and utilize the ordinary wasted heat in the customary open front fireplace, the ensemble to be constructed and installed when the fireplace is being built. The invention is said to "consist essentially" in providing a "hot air chamber" positioned around the fire box (fireplace) and the pipe leading from the fire box, and providing suitable air vents in connection with this "air chamber" to permit of the circulation of the air heated by the chamber, within the adjacent room or rooms.

The fire box has the top part provided with an upwardly extending "neck," the sides and front of this neck inclining upwardly at an angle of approximately 45 degrees while the back is vertical. A "hood" device is positioned above the fire grates and it narrows or flares inwardly and upwardly toward its top vent which communicates with the lower end of the "smoke pipe" which pipe passes upward and terminates at the chimney. The lower part of the "hood" is fitted with a "damper" of the ordinary form which can be manipulated from the interior of the room.

Cool air is admitted to the "hot air chamber" by cold air vents located adjoining the ground floor of the room, and when passing upward through this "chamber" this air becomes heated and is then discharged into the room through a "hot air vent" adjacent to the ceiling of the room and which is equipped with a "register" or grille to control circulation of the hot air. The sheet metal pipe enveloping the hot air chamber actually forms a lining to the ordinary brickwork of the chimney and fireplace.

By way of summation, the specifications state that "the spirit of the invention resides principally in the provision of a heating chamber surrounding the fire box and the smoke pipe and suitable inlet and outlet vents connected with the chamber and arranged to effect an auxiliary air circulation within the adjacent room or rooms." The single claim recited in the Letters Patent sets forth the following:

"What I claim as my invention is:

"In an open grate fireplace, a fire box provided at the top and toward the rear with an upwardly extending neck, a band permanently secured to the outer side of the neck, said band and neck being provided with suitably spaced screw threaded openings, a collar inserted within the neck and extending above the same, screws securing the collar through the casing to the band, an upwardly flaring hood having the lower end mounted on the collar, a smoke pipe communicating with the upper end of the hood, an inclosed air chamber surrounding the fire box and smoke pipe, said air chamber extending for a considerable distance up the smoke pipe, a cold air vent opening to the bottom of the air chamber and a warm air vent leading from the top of the air chamber."

In the Browell patent (1882) a fireplace is also utilized as the source of heat. In the specifications the invention is stated to be "an improved chimney." An inner cylindrical flue or pipe passes directly upward from the fire in the fireplace and leads directly to the roof where it vents the products of combustion into the atmosphere. This flue is to be formed of sections of "earthenware or other pipe."

Surrounding this inner flue is a metal cylindrical tube or "outer casing" which may be formed of sheet-metal sections "properly secured together at the joints." This metal cylindrical tube or casing is so positioned in the chimney that an "air space" is created between its inner sides and the outer sides of the inner fire flue. By this arrangement the air in this air space becomes heated by contact with the hot inner flue and "may be diverted through suitable tubes or passages into rooms adjacent to or distant from the chimney."

The metal cylinder is kept from pressing toward and/or against the inner fire flue of any point along its length by employing metal springs or elastic "braces" which may be placed in position at the joints of the earthenware inner fire flue and are employed to keep the "air space cylinder" in proper position to function as above indicated.

The specifications further set forth that in order to divert the heated air into the room or rooms to be heated, "the space between the outer and inner sections (of the chimney) must be interrupted at some point above the (warm air) outlet (or outlets); otherwise the air would all escape at the top instead of passing into the rooms. This is effected by a cap which may be fitted at or near the top of the outer section (the air chamber) or at any intermediate point or points. The heated air will then be *forced* out into the apartments as desired." (Emphasis supplied).

The Browell specifications also call for employment of a "secondary flue" which extends upward by the side of and in contact with the chimney and this "flue" is heated by this contact; this heat produces an upward flow of air through this flue, "and this flue may be used for ventilating purposes, leading into a 'ventilating tower' at the top of the house." [3]

The single claim that the invention was new recited that "in a double chimney having the inner smoke flue composed of sections E, as shown, the joint-bands F, surrounding said sections, and having the curved elastic stays G connected with them and pressing against the interior of the outer section, substantially as and for the purpose herein described."

The Hamilton device patent (granted in 1885) is captioned in the patent as a "hot air heating apparatus." According to the specifications it utilizes "ordinary open grates for heating rooms *above those in which the grates are*

---

3. An inspection of the schematic diagram appearing in the patent does not disclose the existence of air-intaking openings at the bottom of either the "hot air chamber" *or* the "secondary flue" in the Browell assembly.

placed." The fireplace pictured in the Letters Patent appears to be an open-faced fireplace of the ordinary character in common use in that period. To accomplish its purposes the inventor described his invention as one which "consists in an arrangement of flues and heating-tubes" which are the subject of the claims. Positioned above the fire grates is a so-called "hood" or canopy which "covers the space over the grate," and from the top of this hood a circular pipe called the "smoke-flue," or "flue pipe" is carried upward.

In the *upper room to be heated* by the apparatus (apparently at its floor level) is a "ring plate" located at the bottom of an aperture or hot air vent which opens into this upper room, and to this ring plate is suspended a so-called "lower pipe" which *terminates* just above the "hood." This pipe divides the space *outside* the "smoke-flue" into two flues, the *outside one* connecting with an exit or aperture which opens into the lower room where the fireplace is located; the *inner one* communicating with the upper room through an opening.

The hood device is to be set far enough down "to leave an opening for the entrance of hot-air to the inner and outer flues above mentioned, and to obtain a good supply of highly-heated air."

Two tubes are fitted in the fireplace itself *with their lower ends opening near the floor of the* (fireplace) *room,* and extending at their upper ends into the air-flues above mentioned. These tubes will remove the coolest air from the lower part of the (fireplace) room and deliver it highly heated. The specifications aver that "it is evident that the air rising in the 'inner flue' will become more highly heated by its contact with the smoke-flue, and thus much heat that would otherwise be wasted will be utilized." The specifications further provide that "suitable doors and dampers are to be provided for regulating the heat." (Emphasis supplied in comments on the foregoing three patents.)

### The Holly Device as Patentable Invention.

In examining the record in this case we have been fully mindful of the teachings of Great Atlantic & Pacific Tea Co. v. Supermarket, etc. Co., 340 U.S. 147, 71 S.Ct. 127, 130, 95 L.Ed. 162 where the important question of patentability of mechanical devices came under close scrutiny. The Court there decided, inter alia, that "only when the whole (of a device the elements of which are old in the art) in some way exceeds the sum of its parts is the accumulation of old devices patentable." Since all of the devices here involved are mechanical contrivances the Atlantic and Pacific Tea case imposed upon the lower court the necessity of answering some pertinent fact questions posed by the record before it, and the contested issue of patentability of and invention in the Holly device naturally presented such queries as: Were *all* of the elements of that device old, well-known or used in the art when it was patented? If so, does the "whole" of the device "in some way" exceed the sum of its parts? Is it "wanting in *any* unusual or surprising consequences from the unification of its elements"? If all of its elements were "old in the art" did they take on "some new quality or function which produced a new and better result in the room-heating art from being brought into concert"? If so, did these elements then contribute to the room-heating art any new and unique quality and distinction which reflect novelty and utility and thus contribute any measureable and substantial advance in that art? The record reveals that these questions were considered and adequately answered by the lower court as will be apparent from its elaborate and sweeping findings which we later summarize.

■ If we were to assume (which we do not) that *all* of the elements found in the Holly apparatus were old in the art when measured against elements, some of which were shown in one and some in another or more of the cited prior patents, we would still not come up

with a wholly satisfactory answer to the question of patentability of the Holly machine. As far back as 1878 the Supreme Court, in a leading case, pointed out that the separate presence of the elements of a combination in three or four other patents in the prior art does not preclude a finding of invention when these elements are later so combined as to produce *a new or better result*. Judge Yankwich applied this principle in Kammerer Corp. v. McCullough, D.C., 39 F. Supp. 213, at page 216. His judgment in that case was affirmed by this Court in McCullough v. Kammerer Corp., 9 Cir., 138 F.2d 482, certiorari dismissed 323 U. S. 327, 65 S.Ct. 297, 89 L.Ed. 273. In adhering to the principle above noted, the trial judge adopted language found in Bates v. Coe, 98 U.S. 31, 48, 25 L.Ed. 68 where the Court says:

"Where the thing patented is an entirety, consisting of a single device or combination of old elements, incapable of division or separate use, the respondent cannot escape the charge of infringement by alleging or proving that a part of the entire thing is found in one prior patent or printed publication or machine, and another part in another prior exhibit, and still another part in a third one, and from the three or any greater number of such exhibits draw the conclusion that the patentee is not the original and first inventor of the patented improvement."

We have referred to the Atlantic and Pacific Tea case because appellant insists that the Holy device is nothing more than an aggregation of old elements which were incorporated in one or the other of the various prior art patents cited by it as evidence of anticipation, with particular emphasis on the three fireplace devices we have described. In its brief it lists the "elements" set forth in Claim 1 of the Holly patent which it asserts "comprises the patent." It argues that of these elements the only ones not expressly admitted to be old by Hollingsworth, the patentee, are elements 6,

8, 9 and 11. As described by appellant these are: (a) a second box mounted on top of the first extending from the first box nearly to the ceiling (the box and its radiator air passages and grille arrangement being the "secondary heat exchanger" or "economizer" above referred to) (b) the cross section of the second radiator is smaller in diameter than the first (lower) radiator, (c) means for discharging air from the second (upper) box into the room adjacent to the ceiling (through an upper grille or register), (d) the second box having an inlet near its bottom and adapted to receive air flowing upward *outside* the first box and *inside* the wall.

This suggestion poses the question whether this "economizer" or secondary heat exchanger constitutes an "element" in the Holly device which will (to quote the Supreme Court) "perform any additional or *different function*" (i. e., a special purpose) when brought into concert with the other elements in the combination than it would perform out of it. The trial court was persuaded that it does perform exactly that sort of function, and so are we. From the entire record it appears that a "heat exchanger" or "economizer" of this peculiar construction and arrangement has never been embodied in any type of mechanical wall heater apparatus prior to its aplication and use in the Holly device. The earlier patented devices all of which were in evidence cannot be said to embody in any material way the dual heat-passing functional operation accomplished by the use of the upper box "economizer" integrated into the complete Holly device. In our opinion this arrangement of parts has caused all of the elements incorporated in the Holly combination to cooperate in a new way to produce a new, useful and unexpected result in the room-heating art. This combination spells out both novelty and utility. As reduced to practice its attributes have caused the Holly device to take on a new and unique quality and distinction which clearly makes it a new and useful improvement in wall heaters

fired with gaseous fuel and as such it represents a measureable and substantial advance and improvement in the room-heating art and a valuable contribution thereto.

Furthermore, a careful look at the prior art patents in evidence makes it impossible to conclude that creating the compact wall combination in suit would have been a simple, obvious and fairly easy chore for a skilled mechanic familiar with room-heating problems after he had seen these Letters Patent and understood the construction and method of operation of the devices there described. In our view the whole of the Holly device yields "surprising consequences" which others in the heating field failed to find "obvious."

■ In addition, the record establishes a ready and widespread acceptance of the Holly device on the market and attendant commercial success. When the indicia of invention we mention are taken into account together with the true state of the prior art and what the patent in suit accomplished to improve the art, it must be concluded that it represents invention. It is fair to add that it certainly lacks any of the hall marks of a so-called "gadget patent" concerning which there has been critical comment from time to time.

A brief glance at the claims of the patent in issue reveals that the Holly patentees definitely *claimed* the structure and utilization of this new "economizer" assembly as an essential and integral part of their binary device. And we think it abundantly plain that the Patent Office could only have understood that this "economizer" box of the device was claimed and regarded by the patentees as constituting a new and necessary element and part of the entire mechanism, and one essential to the successful performance of the functions, purpose and overall use for which the combination was designed. We hold that the Holly patent in suit represents invention and is valid.

## The Findings of Fact.

The lower court made and entered thirty-three separate findings which in great detail cover contested issues of fact. Despite this fact appellant strenuously urges that they find no support in the evidence and do not support the judgment. This sweeping conclusion rests in the main on the contention that the court erred in failing to make a finding as to "any differences between McLeod and the patent in suit" other than that they were different. It is also urged that the findings present "no indicia of what the District Court determined the invention was or how it differed from the prior art," or what was "new" in the Holly device, hence the judgment is "entirely unsupported by the findings." While not the subject of argument in the brief, appellant also presents in its specifications of error the claim that the court failed to hold that certain of the claimed prior art patents in evidence (other than the McLeod, Browell and Hamilton patents) anticipated and showed lack of invention in the Holly patent.

■ The foregoing objection to the scope and coverage of the findings seems based on the assumption that it was the legal duty of the lower court to therein set out a detailed description of and a most meticulous comparison between each and every element in the patent in issue and every element found in the earlier patents introduced by appellant as evidence of anticipation; that since this involved procedure was not adopted, it is our duty to declare the court's findings fatally defective. This contention lacks merit. The findings are sufficiently comprehensive and pertinent to the fact issues to provide a basis for decision; they dispose of material and contested issues, and are not clearly erroneous in whole or in part.

In deference to the lengthy objections voiced by appellant and because this is apparently the first action involving the validity of the Holly patent,[4] we have

4. The trial court did not write an opinion in this case.

deemed it desirable to burden the opinion at this point by a summary of the findings wherein the court found:

The accused devices are Coleman wall heaters models No. 64, 67, 68 and 69; that prior to November 2, 1953 these heaters manufactured and sold by Coleman were equipped with 4-foot economizers; that at all times from and after November 2, 1953 Coleman has not manufactured and sold such heaters equipped with its 4-foot economizer; that all wall heaters of these numbered models manufactured and sold by Coleman since November 2, 1953 have been equipped with a 3-foot economizer; that Coleman has manufactured and sold substantial numbers of its wall heaters models of the foregoing numbers with both the 4-foot economizer and the 3-foot economizer; that for a long time prior to the invention of the patent in suit, the thermal in-put of wall heaters could not be increased substantially without excessively heating combustible walls in which the heaters were installed, and that these hot walls were encountered in both the lower and upper portions of the wall between floor and ceiling adjacent the heater; that wall heater manufacturers have no control of the height of flues attached to their heaters in buildings and that prior to the invention of the patent in suit, there was inadequate control of the amount of warm air sucked from the room into the flue from the draft hood and thus lost, with consequent decrease in heating efficiency; that the combination of elements described and claimed in the patent in suit cooperate to permit the thermal in-put of wall heaters to be increased without bringing about excessive wall temperatures at any point in the wall from floor to ceiling, and without reducing thermal efficiency of the wall heaters; and that the invention of the patent in suit has simultaneously solved the hot wall problem from floor to ceiling, increased thermal efficiency while permitting increased heat in-put, improved air circulation within the room, minimized heat loss due to warm air being sucked out of the room into the flue through the draft hood, and has rendered this heat loss substantially independent of flue height.

The Court further found: That it required the exercise of inventive faculty to invent the combination defined by each of claims 1, 2, 3 and 4 of Letters Patent No. 2,602,441 in suit; that the combination of elements defined by each of the said claims of the patent in suit cooperate to produce a new and beneficial result unattained before the invention of said patent was made, and that the results of such combination exceed the accumulation of the results of the individual elements of such combination; that John H. Hollingsworth and Karl L. Bedell, who are named as the inventors in the patent in suit, are the original and first inventors of certain new and useful improvements in gas-burning wall heaters as claimed in each of the four claims above noted; that the Letters Patent in suit is valid as to each of the claims above referred to; that the disclosure contained in Letters Patent No. 2,602,441 in suit is sufficient to enable a person skilled in the art to which the patent pertains to accomplish the objects of the invention; that said Letters Patent is not ambiguous, incomplete, or insufficient, and the description of the invention filed in the Patent Office was not made to contain less than the whole truth relative to the alleged invention, nor was the description so filed made to contain more than was necessary to produce the desired results and the description of the invention was not designed to mislead the public as to its character; that each of the four claims of the patent in suit is supported by the specification in said patent and, construed in light of such specification, each of such claims particularly points out and distinctly claims the parts, improvements or combination of the invention and the inventions claimed in each of said four claims of said patent is not different from any inventions indicated, suggested, described or claimed in the application therefor.

The Court further found that the fourteen prior art patents introduced in evi-

dence by Coleman for the purpose of showing that the invention of the patent in suit was anticipated by the prior art, taken either singly or in combination, do not describe a gas-burning wall heater wherein the principle, or mode of operation, or results attained are equivalent to those of the patent in suit; that all of said prior art patents, taken either singly or in combination, do not describe or suggest the group of cooperative elements described and claimed by the patent in suit; that out of these fourteen patents five were cited by the Patent Office in the file wrapper of the patent in suit but neither the remainder of said patents shown in said exhibits nor any other prior art relied upon by defendant more nearly discloses the invention of the patent in suit than do the references cited by the Patent Office in the file wrapper of said patent; that none of the prior art references, taken either singly or in combination, anticipates the invention of the patent in suit which invention represents a new and useful improvement in wall heaters fired with gaseous fuel and has provided a substantial contribution to the art.

The Court further found: That the proceedings in the Patent Office had as to the application for the patent in suit, serial No. 222,500, before the court as an exhibit, or the file wrapper of the abandoned application, serial No. 157,670 filed April 24, 1950, and before the court as an exhibit, do not limit the scope of the four claims of the patent in suit above noted; that Holly made no admissions in either of said file wrappers which would restrict or limit the scope of the four said claims above noted; that prior to serving and filing the complaint herein Holly gave written notice of infringement to the defendant; that Coleman's wall heaters, Models No. 64, 67, 68 and 69 equipped with its 4-foot economizer, contain all the elements of each of the first four claims of the Letters Patent in suit; that Coleman's wall heaters, Models No. 64, 67, 68 and 69 equipped with its 3-foot economizer, exemplified by exhibits, contain all the elements of each of first four claims of the patent in suit, above noted; that Coleman undertook the manufacture and sale of its wall heaters, Models No. 64, 67, 68 and 69 after Coleman's New Products Committee and its design engineers had seen an exemplar of Holly's device which embodied the inventions of the patent in suit; that Coleman's wall heaters of the four models above noted manufactured and sold by Coleman prior to November 2, 1953 employed a 4-foot economizer which was adapted to receive air flowing upward outside the first box and inside the wall as taught and claimed by the patent in suit.

The Court further found: That after Holly had sent notice of infringement of the patent in suit to Coleman, it represented to Holly that it was redesigning the Coleman wall heaters, Models No. 64, 67, 68 and 69 to prevent the flow of air upward into the second box or economizer from the conduit provided outside the first box and inside the wall, but that Coleman's redesigned wall heaters of these models which were manufactured and sold by Coleman on or after November 2, 1953 and which employed its 3-foot economizer, did not prevent such flow of air; that Coleman's wall heaters of the said four models and sold by it on or after November 2, 1953 employed its so-called 3-foot economizer which was adapted to receive air flowing upward outside the first box and inside the wall as taught and claimed by the patent in suit; that the upper radiator in all of said four models of the Coleman wall heaters, above mentioned, is made substantially smaller in horizontal cross section than the first radiator in such heaters in order to minimize loss of efficiency of the heater when warm air is drawn from the room through the draft hood to dilute the combustion products in the upper radiator; that all of Coleman's wall heaters of the four models above noted infringe each of the claims 1, 2, 3 and 4 of the Letters Patent of the patent in suit; that the inlet grilles on Coleman's devices contribute some air to the flow of air through Coleman's economizers as exemplified by exhibits; and that at best, such grilles function

merely as an addition to the structure and do not avoid infringement.

The Court further found: That Coleman's infringement of the claims 1, 2, 3 and 4 of the patent in suit has been and is intentional, conscious and deliberate and that it threatens to continue to infringe said claims and will infringe them unless enjoined by the court; that all of Holly's wall heaters exemplified by its exhibits embody the inventions claimed by the patent in suit and that its manufacture and sale of wall heaters as exemplified by its exhibits has been commercially successful, and that Coleman has had substantial commercial success in the manufacture and sale of its four wall heaters models of the four numbers above mentioned; that Holly has committed no acts which prevent it from seeking or obtaining relief in a court of equity for infringement of its patent in suit.

### The Issue of Infringement.

In denying infringement appellant asserts in its brief that both of its models "are manufactured in accordance with the patent of Browell" which shows "the same type of construction as used in both of appellant's heaters and teaches the art the use of such devices."

Appellant also urges that the description of the physical features found in the Hamilton fireplace is "the description of" the (appellant's) economizer.

As to the prior McLeod patent appellant tells us that in this device "the fireplace comprises a lower heater *differing* from the admittedly old lower heater of the patent in suit *only* in burning wood or coal rather than gas. There is a draft hood at the top of the fireplace and before the flue commences. *The flow of air in this economizer is identical with that of the patent in suit*. Air comes up around the lower fireplace box and then up around the *second heat exchanging box* and out adjacent to the ceiling of the room. This device adds to the efficiency of the fireplace by saving some of the heat passing up the flue and transmitting it to the room and it also reduces wall temperatures because of the cooling effect of this box. *The heat exchange box functions identically with the 'economizer' of the patent in suit.* In fact, it is an 'economizer' *and has the identical parts* as that of the patent in suit." It is further urged that the elements in the Holly device accomplish individually their purposes taught in the prior art and when combined accomplish the result that was old in the McLeod combination. (Emphasis supplied.)

In our view these contentions as to anticipation are adequately refuted by the physical construction and operation of these old fireplace devices to which we have previously referred at length.

In footnote one we have indicated the nature of the charge of infringement set forth in appellee's first supplemental complaint. As to appellant's two (3-foot and 4-foot) models there mentioned appellant contends at some length that certain air intake changes affecting the passage of air currents into the upper box from the floor level were made in its three-foot economizer model which caused it to operate differently than appellee's device, but concludes that "all of the evidence and reasons for lack of infringement that apply to the 4-foot economizer apply equally to the 3-foot economizer." It admits that the amount of air that enters "either the 4-foot or 3-foot economizer from the space around the lower heater is a matter of direct dispute." The lower court quite evidently refused to accept the version of appellant on this particular fact question and we find no reason to quarrel with this decision.

A careful consideration of the entire record (including exhibits) convinces us that all of the essential parts and elements of appellee's device have been, with immaterial variances, faithfully copied by appellant in constructing its various models here claimed to infringe appellee's patent. There is most persuasive evidence in the record to sustain this conclusion. Aside from all of the other evidence adduced the record reveals that it was not until after Holly's new wall heater with its "secondary heat exchanger" was on the market and en-

joying commercial success that Coleman undertook the design of the claimed infringing devices. At that time the Holly heater was the only one on the market employing such an "exchanger." Furthermore, the many admissions by appellant in response to requests for admissions serve to reveal (save in what we regard as immaterial variances in construction claimed to affect the passage of air from the bottom of the competing devices) that the Coleman devices contain all of the elements called for by claims 1 through 4 of the patent in suit. We think these slight variations do not serve to show that the accused Coleman devices do not function as taught by the Holly invention.

At trial a witness for appellee was questioned regarding certain statements appearing in a deposition of one Giwosky, the design engineer in charge of the project to design the accused Coleman devices. The reference to the Giwosky statement appears in redirect examination by Mr. Hoegh, appellee's counsel, the questions and answers concerning his statements being as follows:

"Q. Mr. Giwosky, when you designed the Coleman heaters, Nos. 64, 67, 68 and 69, had you seen a Holly heater with a secondary heater exchanger? A. Yes.

"Q. And had you seen the Holly patent, which is in issue here? Are you familiar with the patent? A. No, I am not too familiar with the patent. I don't understand too much about them.

"Q. Had you seen the patent at the time you made the design? A. No, I don't believe so.

"Q. But you had seen the heater? A. Yes.

"Q. That is, the one that has, what Holly refers to, the secondary heat exchanger? A. Yes. It is our practice to get all our competitors' heaters in; we make it a business to get every heater.

"Q. Did any other heaters come on the market with a secondary heat exchanger? A. Not to my knowledge.

"Q. Holly was the only one? A. As far as I know, that is right."

"Mr. Hoegh: Would you stipulate Mr. Giwosky was the design engineer in charge of the project to design the Coleman wall heaters with the economizer?

"Mr. Lyon: [for appellant] I will stipulate to that.

"Mr. Hoegh: That will be satisfactory."

The three prior fireplace patents above discussed and heavily relied on by appellant represent earlier concepts of heat conveyance through the use of such fireplaces, but in devising their apparatus the Holly patentees clearly appear to have parted company with the basic design portrayed by these concepts to create something new in overall construction and functional operation—a compact unitary wall device which could easily be adapted to the modern pattern and mode of living under conditions of urban life (or where gas would be available) and where an effective and reliable single-room gas-burning heater device would be highly desirable and certainly very useful.

We find no merit in appellant's claim of non-infringement in the manufacture and sale of its devices. The lower court did not err in finding that all of appellant's wall heater models No. 64, 67, 68 and 69 infringe each of claims 1, 2, 3 and 4 of Letters Patent No. 2,-602,441 in suit; that such infringement has been and is intentional, conscious and deliberate, and that the infringement will continue unless enjoined by the court.

### The Issue of Equitable Relief.

As respects the last finding of the court above noted relative to certain claimed acts of Holly wherein the court found that Holly was not deprived of a right to seek and obtain relief, appellant avers that Holly came into court with unclean hands because on February 13, 1954, it published in a Denver, Colorado trade journal available to the construction industry an article stating that "Holly has won four previous suits con-

testing Coleman's heat economizer ideas, claiming they were developed from Holly's principals." It is urged that this publication was a libel since it purported to quote one Gressett, a manufacturer's representative for Holly.

The lower court was informed, and the parties agreed, that the case at bar was the first and only lawsuit over the Holly patent. The record shows that on March 3, 1954 the same trade publication published a retraction by Gressett of the statement attributed to him in its issue of February 13, 1954. In this retraction Gressett stated that the story about Holly winning four previous suits was erroneous but that an infringement action (the one at bar) was then being prosecuted in the Federal District Court.

■ The specific contention pressed on us is that the subsequent retraction "was not of the same type" as the libelous one since it appeared "on an interior page of a later journal." On the record before us we cannot conclude that the court erred in its finding on this issue.

The parties had a fair trial in which the court met and correctly disposed of all pertinent and material issues of law and fact. Its judgment is affirmed.