WELSH CO. OF CALIFORNIA, a corporation, Appellant,

v.

STROLEE OF CALIFORNIA, INC., a Corporation, Appellee.

No. 17736.

United States Court of Appeals Ninth Circuit.

Feb. 14, 1963.

Lawrence H. Cohn, Cohn, Powell & Cassidy, St. Louis, Mo. (Harris, Kiech,

Russell & Kern, Los Angeles, Cal., of counsel), for appellant.

Lyon & Lyon, R. Douglas Lyon, Los Angeles, Cal., for appellee.

Before STEPHENS, BARNES and JERTBERG, Circuit Judges.

BARNES, Circuit Judge.

Strolee of California, Inc. (herein referred to as Strolee or appellee) sued Welsh Co. of California (herein referred to as Welsh or appellant), and in its first amended and supplemental complaint alleged patent infringement of Patent Numbers 2,728,580 and 2,798,730, with consequent damages, because of the construction and sale of collapsible baby strollers by Welsh. The district court awarded judgment to plaintiff Strolee and Welsh appealed to this court. We vacated the judgment and remanded the case for further findings. 9 Cir., 290 F.2d 509. The original findings were thereafter supplemented by New Findings 24 to 26, inclusive, and 67 to 86, inclusive, appearing in the record before us on this second appeal.

This case was originally reversed because we were critical of certain findings which were too broad and conclusory—findings which did not reveal the "basic facts on which the District Court relied." We cited Dalehite v. United States, 1953, 346 U.S. 15, 24, n. 8, 73 S.Ct. 956, 962, 97 L.Ed. 1427. We specifically referred to, as insufficient, Findings 24 and 25 (with respect to reduction to use and practice); to the inconsistency between Findings 24 and 25; to the insufficiency of Findings 27, 28 and 29 (with respect to anticipation and invention); and the inconsistency between Findings 24 and 27. We referred to the lack of any findings with respect to the reliability of witnesses. All these findings had been made with respect to Preisler Patent Number 2,728,580. On this appeal, old Finding 24 has been eliminated, and additional findings have been made (Numbers 24 to 46, inclusive). Old Findings 27, 28 and 29 have been replaced by new Findings 49, 50 and 51.

These new Findings, 1 to 51 and 77 to 80, inclusive, relate to the Preisler Patent alone. Old Findings 30 to 44 become new Findings 52 to 66. Old Finding Number 45 is eliminated and replaced by new Findings 67 to 73; Findings 46 and 47 become 74 and 75; Findings 48 and 49 are replaced by new Finding 76; old Findings 48 to 51, relating to the Smith Patent are eliminated, and new Findings 77 to 80, relating to the Preisler Patent, and new Findings 81 to 86, relating to the Smith Patent, are added.

Having examined and compared the present findings, we turn to the inventions claimed. As we noted in our previous opinion, old Finding 30 (and new Finding 52) establishes "that the Smith device is no more than the Preisler stroller enhanced by an adjustable backrest and an adjustable footrest." Old (and new) Finding 7, with respect to what constitutes the Preisler invention is augmented by new Finding 77. We find then, that the Preisler invention is a combination of four elements:

 (1) A base frame.

 (2) A handle frame pivotally connected to the base frame.

 (3) An armrest frame pivotally connected to the base frame; and

 (4) An inverted U-shaped toggle bar pivotally mounted to the base frame and to the open end of said armrest frame at the *outside* thereof to bear against the armrest frame. (Emphasis made in oral argument.)

The first three elements are, and have been well known to the prior art. In fact, it would seem impossible to construct a *collapsible* baby stroller of any kind without using a base for the wheels, an armrest to confine the infant, a handle frame to control the vehicle; and further, to have pivotal connections between these members to permit them to fold into a smaller space.

We turn to the U-shaped toggle bar. It is Numbers 37, 38 and 40 in the Fig-

ures attached to Plaintiff's Exhibit 1 (Tr. 341, 342). (The legs of the U-bar are Number 37, the bar itself, Number 38, the main section or cross-connection, Number 40.) A toggle bar is a bar having a series of joints, known as toggle joints. A toggle joint is defined as "a devise consisting of two bars jointed together end to end but not in line, so that when a force is applied to the knee tending to straighten out the arrangement, the parts abutting or jointed to the ends of the bar will experience an endwise pressure." The principal advantage claimed by this invention in suit is that it is "a novel means for positively releasably locking the apparatus in normal or expanded position." (Tr. 343.) This does not refer to the latch means locking the essential pivotal connections between the toggle bar and the base and armrest frames, for that device is old in the art.

The apparatus is "locked," (apart from the locking operation of the latch) in an opened position by the contact between the bottom line of the U, (then inverted) and the armrest frame (No. 30). This armrest, U-shaped in front, is pivotally secured to the sides of the handle frame, and "rearwardly of this, the frame 30 has depending portions 34, which terminate in rearwardly inclined end portions 35 which are pivotally connected at 36" to the legs of the toggle bar.

Thus by placing the inverted U-shaped toggle bar *outside* the armrest frame, the arc through which the toggle bar can swing from its lower pivot is ended in a forward direction when the base of the inverted U, at each side, comes into contact with the lower curve (No. 35) of the armrest.

It is obvious that this mechanical contact between toggle bar and armrest exists only to the extent of the width of the material from which the armrest is made. The same purpose could be accomplished with the use of two independent toggle bars. The cross-connection (40) area existing in the toggle bar inside of the two portions of it which do come into contact with the armrest bar (38) can have no effect in stopping a forward movement of the toggle bar. The connection (40) can, however, strengthen the stroller, and does form a convenient handle with which the forward movement of the toggle bar (which holds the stroller in an expanded position) can be reversed, i. e., pulled upward from its approximate 45 degree angle, "over-center forward" to the center line,[1] and consequently backward, so as to cause the collapse of the stroller.

The "over-center position," with prevention of the toggle bar going too far over-center, in order to hold a device in a locked position, is old in the art.

We are referred first by appellant to the Goodman Patent Number 2,678,219, issued May 11, 1954, with the application filed December 17, 1951 (Defendant's Exhibit A–Q). It shows the same toggle joint construction, save that in Goodman the devices preventing the full forward arc movement of the two independent toggle bars (connecting the armrest frame, therein called "load support member"), are two independent latches. After describing latches pivoted on the rear wheels and pivotally connected to the base member, Goodman describes: "The second pair of links 52 also carry spring based pins or latches 58 which are adapted to be inserted in or cooperate with holes or recesses 60 in the flattened ends 42 of legs 34 to rigidly lock links 52 in position with respect to legs 34."

We note that Goodman was a reference cited on Preisler's application.

Appellant also relies on the Burst Patent, Number 2,013,910, issued September

1. This is a center line with respect to two points—the point of pivotal connection between the armrest and the toggle bar, and between the armrest and the handle frame. When forward of this center line, weight in the stroller increases the stability of the open position; when rearward of this center line, weight in the stroller hastens the change to the collapsed position.

10, 1935, as prior art. (Defendant's Exhibit A–R.) It shows a collapsible frame for baby buggies, with several toggle joints which are held in place as follows:

> "A clip or strip 17 is held by a rivet 18 to the handle bar 9 and forms an abutment to engage the scissor bar 3 *to limit the extent of relative movement* of the knee members formed by the pivotal pin 11. The arrangement of the toggle is such that when overthrown it presses the knee outwardly until the knee members are in line, where they are limited in their movement by the abutment 17.

> "A cross bar 19 connects the scissors bars 4, one on each side of the frame[2] and are so positioned to engage extended portions 20 of the toggle links 12, thus providing a stop for and limiting the extent to which the toggles may be overthrown. *A cross bar 21 connects the members 12 of the two toggles whereby they may be and are operated in unison.*" (Emphasis added.)

We note that cross bar 19 in Burst is *outside* the toggle links.

The same basic toggle idea, with stoppage, is shown in Topper Stroller Patent Number 2,534,539, issued December 19, 1950, but with respect to the foot support only. In it (Tr. 455), the toggle joint (point 117) is pivotally connected between pivotal points 105 and 110, by lever 115 and 116. The upper lever, No. 115, has an extension, No. 118, below the pivotal point,

> "with a lateral flange 119 which is adapted to engage the adjacent portion of lever 116 when it is aligned with lever 115, thereby preventing pivotal movement of the plates 100. When it is desired to fold the footrest * * * the toggle is broken."

It is admitted that a toggle joint is not new in the art, nor is the pivotal connection of one or more frames to permit controlled collapse. The U-shaped toggle bar mounted pivotally *outside* the armrest frame is but another method of stopping a complete pivotal movement, or of limiting the extent of a pivotal movement. The basic result was accomplished in prior art, by means of pins, bars, abutments or extensions. Is this invention?

In the writer's concurrence with the opinion heretofore rendered by this court, the matter of the rejection by the Patent Examiner of Claims 6, 14 and 15, as amended, was mentioned; as well as their subsequent cancellation by applicants.

The file wrapper on the Preisler Patent discloses that originally thirteen claims were made, 6 and 13 were originally rejected as not patentable, citing Bryant Patent Number 2,479,467, issued August 16, 1949, and Heideman Patent Number 2,616,719, issued November 4, 1952. Reconsideration was asked. New Claims 14 to 20 were added.

Thereafter, Reese (Patent Number 2,469,475, issued May 10, 1949) and Goodman (Patent Number 2,678,219) were cited by the Examiner as prior art, and Claims 1, 4, 13, 16, 17 and 18 were rejected as not being patented over Goodman, in that Goodman showed "a link 52 pivotally connected to the axle and to the armrest frame at 54 to form a toggle link. *Invention would not be required to substitute a U-shaped member for the pair of links 52 of Goodman.*" (Emphasis added.)

Claims 3, 6, 14, 19 and 20 were at the same time rejected as being not patentable over Goodman in view of Reese. Reese shows a toggle link 30, 36 pivoted together at 38. A *lug* 34 prevents overcenter movement and a latch 40 is carried by one link and engages the parts together. *Invention would not be required to utilize the lug and latch arrangement of Reese in Goodman.*

Claim 15 was rejected as fully met by Goodman.

---

2. In Preisler, called "legs".

Thereafter Claim 13 was cancelled, and Claims 1, 6, 15, 16, 17 and 18 modified, principally by describing the bar as U-shaped and "limiting the motion" of the toggle joint.

The Examiner responded by citing Tisdell, Number 1,576,075 (1927) and Welsh, Number 2,241,799 (1941).

The over-centering type of toggle joint, to be maintained in position by the weight of the occupant, was said to have been taught by Tisdell and Klingelsmith. Claims 14 and 15 were rejected as not being patentable over Goodman. "*It is obvious,*" said the Examiner, "that the two arms 52 of Goodman could be joined together by a cross bar near their lower ends, in which case the arms and cross bar would constitute a U-shaped member."

For this reason then, Claims 6, 14 and 15 were cancelled by applicant.

Thus, as we understand the record, a claim of invention based on "the U-shaped toggle bar," and "the pivotal engagement between the U-shaped toggle bar and the armrest frame" was dropped as a claimed invention before the Patent Office. When we compare this disclaimer to Finding 77 (Tr. 553), we find the fourth element in the combination and the sole claim to uniqueness in the combination to be:

"An inverted U-shaped toggle bar pivotally mounted to the base frame and to the open end of said armrest frame at the outside thereof to bear against the armrest frame."

Thus the abandoned claim is now sought to be made the basis of patentability in this litigation.

In oral argument, emphasis by appellee was placed on the word "outside" contained in Finding 77. This word does not appear in the claims here involved. Counsel argues that while it does not appear directly, it is impliedly contained therein because there is reference to said "toggle bar normally bearing against the ends of said armrest frame," and this requires that the toggle bar be outside the frame.

We can assume the word is there, but we see no more invention in this than in placing a toggle bar *inside* the armrest frame, with ears, lugs, pins, bars, abutments, or extensions extending to the outside dimension of the frame, all of which devices are old in the art as hereinbefore discussed.

The Smith Patent, co-pending with the Preisler Patent, allegedly involved an improvement on the Preisler Patent; a pivoted adjustable footrest in a baby stroller which is adjustable to form a horizontal extension of the seat member. This footrest is pivotally mounted on the base frame, while the backrest is pivotally mounted on the seat, which in turn is suspended from the armrest frame. The backrest and footrest are thus mounted on different frames. Mounting pivotal rests on one of two frames, rather than upon the other frame, seems a simple and obvious matter of choice, requiring no invention. The frame from which a rest is suspended does not determine its collapsibility, nor the compactness of its foldability.

We deem it unnecessary to cite specifically the prior art described in the file wrapper (Defendant's Exhibit B) which indicates to us that finding of invention over prior art was clearly wrong.

 There was no invention in what plaintiff did here in using the particular inverted U toggle bar, rather than any one of a dozen other means of stopping the pivotal movement. The U bar added strength and perhaps convenience to the entire device, and to this extent might be an improvement over previous devices but we do not think it invention, nor any sweeping or extraordinary result. We quote with approval from Packwood v. Briggs & Stratton, 3 Cir. 1952, 195 F.2d 971 at 973:

"A discovery or devising must add something of significance, though not necessarily very much, to scientific knowledge if it is to take on the quality of invention under a statutory scheme which gives the in-

ventor, for a number of years, a legally protected monopoly in a legal order which generally abhors monopoly. Courts sometimes attempt to describe this quality which invention must reveal as 'creative' or as revealing 'genius'. [Citing Cuno Engineering Corp. v. Automatic Devices Corp., 1941, 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58.]

\* \* \* \* \* \*

"This conception has been particularly helpful in the evaluation of those discoveries in the field of mechanics which have involved only combinations of old and familiar elements and ideas. When, if ever, can such combination be said to add to scientific knowledge? The reasonable and accepted answer is if, but only if, the particular combination yields some surprising or extraordinary result. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 1950, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162. 'The mere aggregation of a number of old parts or elements which, in the aggregation, perform or produce no new or different function or operation than that theretofore performed or produced by them, is not patentable invention.' Lincoln Engineering Co. v. Stewart-Warner Corp., 1938, 303 U.S. 545, 549, 58 S.Ct. 662, 664, 82 L.Ed. 1008. We think, even on patentee's own analysis, the present is as plain a case as can be found of a combination of old mechanical devices and ideas producing no unusual result and adding nothing to scientific knowledge."

We think the subject matter sought here to be patented, compared to the prior art, indicates clearly that the subject matter was obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains. 35 U.S.C. § 103. It is the "standard of invention" which controls. Kwikset Locks, Inc. v. Hillgren, 9 Cir., 1954, 210 F.2d 483; Coleman Co. v. Holly Manufacturing Co., 9 Cir., 1956, 233 F.2d 71; Oriental Foods v. Chun King Sales, 9 Cir., 1957, 244 F.2d 909; Bergman v. Aluminum Lock Shingle Corp., 9 Cir., 1957, 251 F.2d 801.

Many patent lawyers do not look with favor upon the pronouncement of the Supreme Court in the Great A. & P. Tea Co. case that requires the lower courts to:

"scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained when, on the contrary their effect is to substract from former resources freely available to skilled artisans. A patent for a combination which only unites old elements with no change in their respective functions, such as presented here, obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men." 340 U.S. 147 at 152–153, 71 S.Ct. 127, at 130–131, 95 L.Ed. 162 (1950).

■ Believing the lack of validity of the claimed invention is dispositive of the case, we need not reach the remaining issues. We reverse and remand, with instructions to the court below to enter judgment in favor of appellants, with costs.